## EMPLOYING PRINTERS CLUB *et al. v.* DOCTOR BLOSSER COMPANY.

1. A combination of two or more persons to injure one in his trade, by inducing his employees to break their contract with him or to decline to longer continue in his employment, is, if it results in damage, actionable.
2. A former member of an illegal combination, whose connection with it was severed before the filing of the suit, will not be denied the protection of a court of equity against an illegal act of such combination because of his previous connection therewith.
3. The malicious procurement of a breach of contract of employment, resulting in damage, where the procurement was during the subsistence of the contract, is an actionable wrong.
4. A court of equity will interpose by injunction to prevent the several members of an illegal combination from enforcing an illegal agreement to the hurt and injury of one engaged in competitive business.

Argued February 22, — Decided March 25, 1905.

Injunction.　Before Judge Lumpkin.　Fulton superior court. December 2, 1904.

*Smith & Wright,* for plaintiffs in error.　Plaintiff not entitled to complain of rules and agreements to which it was a party: 18 N. J. L. 87; 9 N. Y. S. 529; 60 Tex. 438; 170 N. Y. 321; 56 Hun, 393; 120 *Ga.* 597.　In pari delicto: 11 Paige, 349; 1 McLean, 460; 101 Mass. 363; 1 Chand. 207; 8 L. R. A. 469; 2 Hill, 517; 1 East, 96; 8 T. R. 575; 79 U. S. 349; 10 Me. 71; 14 N. Y. 94; 57 N. Y. 518; 20 Wend. 24; 6 Cow. 431; 38 Fed. 191; 83 Ala. 146; Smith, Con. (3d Am. ed.) 187.

*Howard Van Epps* and *Kontz & Austin,* contra.　Interference with contract relations: 151 U. S. 13; 2 El. & Bl. 216; Bigelow, Torts (5th ed.) 80; 43 *Ga.* 331; Id. 601, 604; 49 *Ga.* 580; 75 *Ga.* 198; 46 *Ga.* 578, 624; 56 N. H. 456 (22 Am. R. 475); 15 S. C. (40 Am. R. 680); 6 S. C. 297 (24 Am. R. 471); 70 N. C. 601 (16 Am. R. 780); 44 Up. Can. 287; 16 A. & E. Enc. L. (2d ed.) 1109, 1111, 1114; Webb's Pollock, Torts (Am. ed. 1894), 278, 279, c. L. R. 2 C. P. 622; 4 Moore, 12 (16 E. C. L. 357, 21 Rev. Rep. 733); 177 Mass. 485; 39 N. J. L. 569; 23 Fla. 206;

107 Mass. 556, 564; 2 Wend. 385; L. R. App. Cas. (1901) 495, 525; 1 Wyman's Cases, 154; Erle, Trade Un. 12; L. R. 2 K. B. (1902) 732; 1 Q. B. 715; L. R. 6 Q. B. Div. 333; Ames, Torts, 613; 106 Mass. 1 (8 Am. R. 287); 176 Mass. 492; 176 Ill. 608 (52 N. E. 924, 54 N. E. 524, 43 L. R. A. 797, 802, 68 Am. St. R. 203); 30 Fed. 48; 17 N. Y. Supp. 264; 59 Vt. 273 (9 Atl. 559, 59 Am. R. 710); 22 N. Y. Supp. 826 (Ames, Cas. on Torts, 701); 147 Mass. 212 (17 N. E. 307); 52 N. J. L. 284 (10 L. R. A. 184); 83 Fed. 912; 32 Am. L. Rev. 124; 55 Conn. 46; 80 Tex. 400; 62 Fed. 803, 818–21; 84 Va. 927 (6 S. E. 620, 10 Am. St. 895); 54 Fed. 730; 69 Wis. 483 (34 N. W. 522); 53 N. J. Eq. 101 (30 At. 881); 67 Vt. 690 (32 Atl. 814); 51 Fed. 260; 182 Pa. St. 236 (38 L. R. A. 382); 76 N. C. 355; 158 U. S. 725; 21 L. R. A. 233; 54 C. L. J. 425–6; 56 C. L. J. 253, 314; 1 Jagg. Torts, §§ 204–7; 2 Add. Torts, 739; 1 A. & E. Enc. L. (2d ed.) 507; 2 Id. 507; 20 Id. 181; Wood, M. & S. 450; 21 Am. L. Rev. 767. Illegal combinations and contracts in restraint of competition and trade: Civil Code, §§ 3668, 5798, 5800; Acts 1896, pp. 68, 73; 115 *Ga.* 429; 111 *Ga.* 789; 104 *Ga.* 188; L. R. App. Cas. (1901) 526; 54 U. S. App. 723 (C. C. App. 141, 85 Fed. 271, 46 L. R. A. 122); 52 S. W. (Tenn.) 853; 1 Eddy, Combinations, § 530, p. 432; 139 N. Y. 251 (36 Am. St. R. 690, 23 L. R. A. 221, and n.); 55 C. L. J. 144, 163; 23 L. R. A. 588; 6 M. & Gr. 205; 21 Am. L. Rev. 509; 33 Id. 885; 34 Id. 164. Definitions of conspiracy: 1 Eddy, Comb. § 576, p. 506, §§ 337, 340, 342, 343, 351, 364; 115 *Ga.* 429; 52 C. L. J. 222, 251; 54 C. L. J. 251; 18 A. & E. Enc. L. (2d ed.) 80; Wright, Crim. Conspiracy, 51, 525; L. R. App. Cas. (1901) 528–9. Conspiracy to do acts which if done by an individual are lawful: 87 N. W. 472; 15 Harv. L. Rev. 402; 176 Mass. 492; Eddy, Comb. §§ 474, 501; L. R. App. Cas. (1901) 501. Agreement not necessary to constitute conspiracy: 114 Wis. 460. Meaning of malice in such cases: 23 Q. B. 598, 608, 613–14; Webb's Pol. Torts (ed. 1894), 409, 669, 670, 671; 52 C. L. J. 163; 16 A. & E. Enc. L. (2d ed.) 1112, 1113, 1115; 53 N. J. Eq. 101, 110 (30 Atl. 881); 43 L. R. A. 799; 3 Wash. 99; 30 Fla. 142; 17 L. R. A. 705; 3 Dak. 119; 48 Mo. 152; 111 Mass. 498; 30 Conn. 80; L. R. App. Cas. (1898) 1; Wyman, Cases on Restraint of Trade, 151; L. R. App. Cas. (1901) 495, 514. Difference between persuasion and threats:

23 Fed. 748, 750–1; 101 Ill. App. 355; 54 C. L. J. 425; 18 Am. & E. Enc. L. (2d ed.) 87.    Malice and not conspiracy is gravamen of offense:    52 N. J. L. 284; 10 L. R. A. 184; Pollock, Torts, 267; 76 Me. 37; 7 Hill, 104; 7 Cow. 445; 2 Gray, 124; 2 El. & Bl. 216; 1 Wms. Saund. 234.    Cases holding malice alone not sufficient:    91 Ky. 121, 135 (34 Am. St. R. 165, 171); 98 Cal. 578; Cooley, Torts, 470; 48 N. Y. 430 (8 Am. R. 559); 2 Wend. 385 (20 Am. D. 623); 66 N. Y. 82 (23 Am. R. 30).    Measure of damages:    23 L. R. A. 588; 56 N. H. 546; 44 Up. Can. 287; 16 A. & E. Enc. L. (2d ed.) 1114; 47 *Ga.* 311 (3); 43 *Ga.* 601; 75 *Ga.* 198; 61 *Ga.* 482; Webb's Pol. Torts (ed. 1894) 276.    Association suable though not incorporated:    L. R. App. Cas. (1901) 426; 56 C. L. J. 221; 15 H. L. R. (1901) 310; 63 Fed. 310 (25 L. R. A. 414); 26 Or. 527 (28 L. R. A. 464); 118 Mich. 479 (42 L. R. A. 407).    Injunction:    45 Fed. 135; 63 Fed. 301; 23 L. R. A. 588; 18 A. & E. Enc. L. (2d ed.) 91.    Doctrine that one who comes into equity must have clean hands does not apply :  1 Pom. Eq. Jur. (2d ed.) §§ 403, 397; 70 Fed. 383, 386; 4 Fed. 32, 34; 92 Ala. 497; 50 *Ga.* 418, 421–2; 115 *Ga.* 429; 11 A. & E. Enc. L. 164; 2 Beach, Eq. Jur. § 16; 66 Ill. App. 571, 577; 65 Md. 73, 84–5; 159 Pa. St. 381, 384; 4 Fed. 32; 96 Cal. 53 (31 Am. St. R. 175); 46 N. Y. 615; 10 O. St. 501 (15 Am. D. 756).

EVANS, J.    The Doctor Blosser Company, a corporation, brought an action against a number of printing concerns using the club or trade name of the "Employing Printers Club of Atlanta," and composed of individuals, firms, and corporations engaged in the book and job-printing trade in the city of Atlanta, and whose names are set out in the record, asking an injunction and praying damages.    The court granted the injunction, and exception is taken to this order.    On the interlocutory hearing the defendants urged by demurrer the insufficiency of the facts pleaded to authorize the relief prayed.    Notwithstanding the demurrer admitted the truth of all the facts which were well pleaded, the plaintiff submitted proof tending to sustain all the essential allegations.

1–3. The complaint is that the defendants formed a combination among the employing printers to control and fix the price of printing done in the city of Atlanta, and, because the plaintiff refused to affiliate with the combination, they wrongfully interfered

with the plaintiff's business and maliciously induced its employees to break their contracts with it and refuse to continue in its employment, to its injury and damage. A combination of individuals engaged in a particular line of business to compel one engaged in a similar business to sell his product at prices fixed by it is contrary to public policy and void; and the members of such a combination, individually and collectively, may, by appropriate injunction, be restrained from wrongfully interfering with the business of the one who is not a member of the combination. This principle is laid down in the well-considered case of *Brown & Allen* v. *Jacobs' Pharmacy Company*, 115 *Ga.* 429, is supported both by reason and authority, and its application to the case in hand is readily ·apparent. The facts alleged in the petition were as follows: The plaintiff was engaged, in the city of Atlanta, in the general business of a printer for the public, enjoying a large trade, and doing a prosperous business. The defendants were also engaged in the printing business, and formed a combination or trust, called the Employing Printers Club of Atlanta, Georgia. This combination embraced nearly the entire printing and publishing fraternity of Atlanta except the newspapers, and its organization was " for the single and sole purpose of restraining trade, of absolutely defeating and destroying competition among bidders for printing of any sort to be done in the city of Atlanta, and for maintaining an arbitrary and extortionate scale of prices upon any contracts that might be received for work done in the city." This combination or club had a written constitution and by-laws, a copy of which was appended to the petition. Among the objects of the club, as recited in its constitution, was "the maintenance of legitimate prices, the suppression of undue rivalry, and mutual.protection from abuses or infringement upon our rights by others." The rules provided for a fixed minimum scale of prices; that no member should give any rebate or concession to a customer; and for a uniform discount only to other members of the association. Rule 8 was: "Never give customer an itemized estimate." The scheme of the defendants, who confederated under the name. of the Employing Printers Club, was as follows: If a customer, desiring to have printing or publishing done, made application for a bid to any one of the members constituting the club, it was the understanding and

agreement among all of the members thereof that the printer receiving the bid for work should name the price for which he was willing to undertake it, and thereupon should list the application, the name of the customer, and the proposition for doing the work, giving a complete description of the job to a manager appointed for that very purpose, and salaried by the members of the combination; and they in turn were bound severally to each other, that if they were also invited to make competitive bids they would fix the price for such equal to or higher than that proposed by the first printer receiving the application and listing the bid. It was alleged that the combination enforced a rule among themselves, establishing a systematic way of handling the public printing for the City of Atlanta, under the operation of which each printer was to have his turn; the manager to keep track of the business and notify the different members when the City of Atlanta asked for bids, whose turn it was to do the work. They were to make the price and add ten per cent., and charge the city not only the fixed, arbitrary price, but also the additional ten per cent. on the fixed price. It was alleged that a committee from the Employing Printers Club, who also represented the defendants as members of the club, waited on the plaintiff, and advised its officers that it could not continue to employ union labor in its shop, unless it became a member of the club. Plaintiff inquired of the committee the purpose and scope of the club, and was informed that it was a secret institution, and that it was necessary to become a member before its secrets could be imparted, To prevent being deprived of union labor, which was the only labor obtainable, and ignorant of the real purposes of the club, the plaintiff became a member thereof. About October 1, 1901, plaintiff made a contract with the managers of the Wesleyan Christian Advocate to publish that periodical, and was proceeding to execute the contract, when it was notified by the Employing Printers Club that it had violated the rules of the club in accepting such contract, and was fined four hundred and sixty-eight dollars for taking the contract. The club decided that the right to print that periodical belonged to the Foote & Davies Company, one of the defendants, and that the plaintiff should not have underbid that company. In addition to imposing the fine, the club ruled that at the end of the year 1902, the publication price of the Advocate for the year 1903 should be

fixed by the Foote & Davies Company. The plaintiff was dissatisfied with this ruling, and resigned its membership in the club. Whereupon plaintiff was notified by a committee from the club, that unless it paid the fine and came back into the club, all union labor would be called out of its shop. The plaintiff, persisting in its refusal to resume relationship with the club, was assured by a committee from the club that it had been reorganized on a legal basis. Upon this assurance the plaintiff resumed its membership in the club, and the fine was reduced to one hundred and twenty-five dollars. The major part of this fine was paid, and plaintiff resumed its membership because of the threat to call out the union labor from its shop, and to avoid the damages incident to the loss of this class of labor. In October, 1902, the Wesleyan Christian Advocate's managers applied to the plaintiff to print that paper during the year 1903, stating that they were aware of the existence of the printers' combination, but before they would pay more than they were paying they would withdraw their work from Atlanta and place it elsewhere. Thereupon the plaintiff made them a bid which afforded a reasonable net profit on the proposed work. The Employing Printers Club then met and sat in judgment on the plaintiff's action in taking the contract for the second time for the publication of this periodical, and adjudged that the plaintiff pay the Foote & Davies Company three hundred dollars in cash, to partly reimburse it for the loss of the profit on the publication of the Wesleyan Christian Advocate, and that the naming of the price for the publishing of this periodical "revert irrevocably" to the Foote & Davies Company at the expiration of the present contract. Several attempts were made to induce the plaintiff to comply with this edict, and it was threatened that if it did not comply, the club would cause all union labor to leave its employment. The plaintiff refused to comply with the club's demand, and declined to affiliate longer with the club as a member, notifying it of this resolve. Then the club caused the pressmen, feeders, printers, and binders employed by the plaintiff to quit work, thereby shutting down the plaintiff's establishment, and rendering it impossible for it to conduct its business or to execute existing contracts, or to undertake further employment in the line of its trade. Actual damages were alleged to have been sustained by the plaintiff in the sum of ten thousand dollars

On the interlocutory hearing it appeared that some of the employees returned to the work, and that their respective unions refused to call a strike in the plaintiff's shop. The defendants then threatened that unless the unions would call out its labor from the plaintiff's shop, they would no longer observe the union regulations. In pursuance of this threat, some of the defendants posted their repective businesses as " open shops." The plaintiff's petition was filed at this juncture of affairs.

There can be no doubt that the facts alleged in the petition, if true (and the demurrer admits their truth), establish, not only a conspiracy to fix and control the price of printing in the city of Atlanta, but also a malicious interference with the business of the plaintiff. The scope and purpose of the Employing Printers Club was to create a monopoly and stifle competition in the printing business. A mere agreement to do wrong is not actionable ; but when the parties to such agreement do an overt act in furtherance of the illegal combination, resulting in injury to a third person, the conspiracy becomes actionable, and the conspirators are liable to the injured party for damages proximately flowing from their illegal conduct. It is contended by the plaintiffs in error, that, conceding that the combination among the defendants was an illegal one, the plaintiff in the court below was a party to it, and can not be heard to complain in a court of equity. It is true that at one time the plaintiff was a member of the trust, but when the trust essayed to discipline it, it repudiated the club and informed its officers that it would no longer affiliate with the club. It was then that the club was proceeding to punish it by calling out its employees. The maxim that one must come into a court of equity with clean hands means that he must do equity as respects the defendant's rights in the particular matter of the suit. 1 Pom. Eq. Jur. § 397. " The rule that a complainant must come into equity with clean hands does not go so far as to prohibit a court of equity from giving its aid to a bad or a faithless man. The dirt upon his hands must be his bad conduct in the transaction complained of. All complainants in equity are human beings, full of faults and sin, and I doubt if there is one case in ten in which the complainant is not somewhat to blame. If the complainant does equity himself, or offers to do it (except in those cases where the rule in pari delicto, etc.

comes in), his hands are as clean as the court can require."
*Ansley* v. *Wilson*, 50 *Ga.* 421. The plaintiff is not seeking to ·
obtain any relief by virtue of its former connection with the club,
and is not therefore in pari delicto with the defendants, relatively
to the cause of action which it brings against them. Its connec-
tion with the club ceased before filing the suit, and it has re-
pudiated the club as an unholy alliance. Even in criminal law,
the locus penitentiæ is recognized. The aggressor may repent
and abandon his felonious enterprise, and place himself in a posi-
tion where he may rightfully invoke the law of self-defense in
a subsequent occurrence. Besides, an unlawful combination in
restraint of trade is a wrong to the public, as well as to the in-
jured individual. If a man confederates with a burglar to break
and enter a house, but abandons the criminal project, his agree-
ment to join in the burglary will not justify an infliction of
an injury upon his person by the burglar, and deprive him of his
right of self-defense, merely because of the prior agreement to do
a criminal act and the abandonment of his unlawful intention.

Independently of the conspiracy, the petition states a case of
malicious interference with the plaintiff's contract of employment
with its employees. At common law the remedies for breach of
contract were confined to the contracting parties, and limited to
direct damages and consequential damages proximately resulting
from the act of him who is sued. This general rule admitted of
one exception, and that was the right of action against a stranger
for wrongfully enticing away a servant in violation of his con-
tract of service with his master. The exception is said to have
been based on the ancient statute of laborers. The early English
cases limited the action to the enticement of menial servants, but
the later cases, beginning with Lumley *v.* Gye, 2 E. & B. 216,
have extended the doctrine beyond menial servants; and by the
modern interpretation of this doctrine by the English courts the
rule is extended to a malicious interference with any contract.
A brief reference to a few English cases will serve to present
the evolution and extension of the old common-law doctrine of
malicious interference with a contract. Lumley *v.* Gye, supra,
was a suit for the malicious procuring of an opera singer, who
had agreed with the plaintiff to perform and sing at his theatre,
and nowhere else, for a certain time, to break her contract and

not perform or sing at the plaintiff's theatre during the time for which she was engaged.    It was there held that an action would lie for maliciously procuring a breach of contract to give exclusive personal service, provided the procurement was during the subsistence of the contract and produced damage; and that to sustain such an action it was not necessary that the employer and employee should stand in the strict relation of master and servant.    The opinion was by a divided court.    The majority of the judges were inclined to the opinion that an action would lie for the malicious procurement of the breach of any contract, though not for personal services, if by the procurement damage was intended to result and did result to the plaintiff.    This case was followed in Bowen v. Hall, 6 Q. B. D. 333.    In 1893 the same question was before the Court of Appeal of the Queen's Bench Division (Temperton v. Russell, 1 Q. B. D. 715), and the cases of Lumley v. Gye and Bowen v. Hall were examined and approved; and these cases were there said to rest upon the principle that to maliciously procure a person to break a contractual relation, which all are bound by law to respect, is actionable; and that a right of action for maliciously procuring a breach of contract is not confined to contracts of personal service.    By many it was thought that the House of Lords case of Allen v. Flood (1898), L. R. App. Cas. 1, conflicted with the doctrine announced in Temperton v. Russell, or at least materially curtailed its scope.    But in the later case of Quinn v. Leathem (1901), L. R. App. Cas. 495, both cases — Temperton v. Russell and Allen v. Flood — were elaborately reviewed and analyzed; and after stating the scope and effect of the latter case, it was ruled that "a combination of two or more, without justification or excuse, to injure a man in his trade, by inducing his customers or servants to break their contracts with him, or not to deal with him or continue in his employment, is, if it results in damage to him, actionable." The Supreme Court of the United States approvingly cited the English cases of Lumley v. Gye and Bowen v. Hall, and reached the conclusion that if one maliciously interferes with a contract to the injury of the other, the party injured may maintain an action against the wrong-doer.    Angle v. Chicago Ry. Co., 151 U. S. 1.    Though this rule is not universal in the courts of last resort of our sister States, it is believed to have been followed

in most of them.   In the carefully prepared opinion in Walker *v.* Cronin, 107 Mass. 555, the court decided that a manufacturer is entitled to maintain on action against a third person, who with the unlawful purpose of preventing him from carrying on his business, willfully induced many of his employees to leave his employment, whereby the manufacturer lost their services, and the profits and advantages which he would have derived therefrom.   See also Moran *v.* Dunphy, 177 Mass. 485.   And the Supreme Court of North Carolina held in two cases (Hawkins *v.* Royster, 70 N. C. 601; Jones *v.* Stanley, 76 N. C. 355), that if a person maliciously entices laborers or croppers to break their contract with their employer and desert his service, the employer may recover damages against such person.

In this State it has been held that when one man employs a laborer to work on his farm, and another man, knowing of such contract of employment, entices, hires or persuades the laborer to leave the service of the first employer during the time for which he was so employed, the law gives to the party injured a right of action to recover damages.   *Salter* v. *Howard*, 43 *Ga.* 601.   From the reasoning of McCay, J., in *Barron* v. *Collins*, 49 *Ga.* 580, it would appear that he was inclined to the opinion that an action for the malicious breach of contract was limited to cases of servants.   The declaration in that case alleged that A, having contracted with one Charles Barron, that he, the said Charles, should furnish himself and his two daughters and one George Barron, to work as laborers on the plaintiff's land for the year 1872, the plaintiff to furnish the land and mules, and the said Charles to receive one third and the plaintiff two thirds of the crop; and that the defendant, knowing that the said contract had not been abandoned, but still existed, employed the said Charles, his two daughters, and the said George, to work for him for the year 1872.   It was held, on demurrer, that no good cause of action was set forth.   In the opinion it was said that the gist of the action was enticing away plaintiff's servants; and that the contract between the plaintiff and Charles Barron did not create the relation of master and servant, but that Charles Barron was a contractor and not a servant.   However, within the limits of a very brief opinion, it was pointed out that the declaration was defective in many other particulars.   It was defective in not setting

forth the nature of the damages. It was said also that perhaps the contract, resting in parol, was not binding, as it was not to be performed within a year. Nor did it appear that Charles Barron was authorized to contract for the service of the others. Inasmuch as the petition was defective in other vital particulars, the judgment of the court was not confined to the question of the malicious procurement of the breach of the contract. Attention is also called to the fact that this case was decided in 1873, when the principle under discussion was in its evolutional stage. Speaking for myself, I believe the same reasons which support the principle that an action will lie for the malicious procurement of a breach of contract of personal service will cover every case where one person maliciously persuades and induces another to break any legal contract. In the case at bar the relation of master and servant did exist between the plaintiff and his employees, and even applying the common-law rule of liability, the defendants would be answerable in damages to the plaintiff for a malicious procurement of the breach of contract by its employees. The term "malicious," used in this connection, is to be given a liberal meaning. The act is malicious when the thing done is with the knowledge of the plaintiff's rights, and with the intent to interfere therewith. It is a wanton interference with another's contractual rights. Ineffective persuasion to induce another to violate his contract would not, of itself, be actionable, but if the persuasion be used for the purpose of injuring the plaintiff, or benefiting the defendant at the expense of the plaintiff, with a knowledge of the subsistence of the contract, it becomes a malicious act, and if injury ensues from it a cause of action accrues to the injured party. Bowen v. Hall, supra. As was said by Compton, J., in Lumley v. Gye, supra, "it must now be considered as clear law that a person who wrongfully and maliciously, or, which is the same thing, with notice, interrupts the relation subsisting between master and servant, by procuring the servant to depart from the master's service, . . . is responsible at law." See Doremus v. Hennessy, 176 Ill. 608.

4. From the proof submitted it appeared that means other than persuasion were employed by the defendants to induce the plaintiff's employees to quit work. They threatened the various labor unions that unless the union labor of the plaintiff was called out,

they would no longer exclusively employ union men, but would run what is known as an "open shop." This threat was being carried into execution, when the plaintiff applied for the writ of injunction. The plan of attack on the plaintiff was to force the various labor unions to call out their members from the plaintiff's shop, under the threat that, upon their refusal to do so, the defendants would run their respective businesses under what is known as an open shop, that is, they would employ their labor without reference to their connection with the various unions. The several defendants had the undoubted right to employ any character of labor they might prefer. If they desired to supplant the union labor and substitute therefor non-union labor, such action would be strictly within their legal right. But the record shows that practically all the skilled labor in this branch of business in the city of Atlanta belonged to the various labor unions, which had an agreement with the defendants that the defendants would hire only union employees, and that the unions would not permit their members to work for any employer who was not a party to the agreement. This agreement was incidental to the main purpose of the organization. It was a part of the plan to force all employing printers to become members of the Employing Printers Club. The defendants were insisting on the observance of this agreement by the labor unions, and upon their refusal to live up to the agreement they were threatened with the bête noire of unionism, the open shop. An injunction may be granted against the enforcement of an illegal agreement of dealers to injure the business of another person. Jackson *v.* Stanfield (Ind.), 23 L. R. A. 588. A court of equity will interpose by injunction to prevent the several members of an illegal combination from enforcing an agreement to the hurt and injury of one engaged in a competitive business. *Brown & Allen* v. *Jacobs' Pharmacy Co.,* 115 *Ga.* 429.

Under the facts in the record the court properly enjoined the defendants from interfering with the plaintiff's business as a printer engaged in competitive trade, and from unlawfully influencing the labor organization from obstructing its business.

*Judgment affirmed.   All the Justices concur.*