The court did not err in refusing a temporary injunction restraining the Atlanta Bar Association and its members in their conduct of an alleged campaign against usurious moneylenders.
 No. 13424. DECEMBER 5, 1940.
The superior court declined, at the instance of C. E. Gunnels trading as Acme Finance Company, to issue a temporary injunction against the Atlanta Bar Association, a corporation, the members of its executive committee, and V. K. Meador, a member of the association, restraining them "from mailing customers of salary buyers, including petitioner, any letters, cards, or other form of communication, suggesting, counseling, advising, inviting, soliciting, or urging such customers to violate their contracts or to file suit or to discontinue to do business with petitioner, or to come to any lawyer's office for free counsel, advice, or other legal service against petitioner or others similarly situated;" "from publishing in any manner, by themselves or through others, any counsel, advice, suggestion, or notice that defendants or any other lawyer will represent, counsel, advise, and furnish customers of salary buyers, including your petitioner, free legal services in the institution and prosecution of lawsuits, or otherwise, against salary buyers, including *Page 367 
your petitioner, and from counseling or suggesting that any one else publish or send such notice;" "from seeking the cooperation of employers of customers of salary buyers, including your petitioner, in the conduct of their campaign against salary buyers, including your petitioner, herein complained of;" "from in any manner interfering with petitioner's conduct of his business, and from in any manner attempting to injure, damage, or destroy your petitioner's business, either by the attempt to create an unfavorable public opinion of your petitioner, or by any other means, either by themselves or through others."
In seeking this relief the plaintiff made substantially the following case: He is duly licensed by the State of Georgia and the City of Atlanta to carry on the business of salary buying, and he brings the present suit in behalf of himself "and others similarly situated." In February, 1940, Philip H. Alston, president of the defendant association, under authority of its executive committee, appointed approximately forty lawyers as a committee "for the alleged purpose of enforcement of usury laws." The defendant V. K. Meador was named and assumed the duties as chairman of this committee. The ostensible purpose of the association through this committee "is to find out whether there are small-loan companies in Atlanta lending money for interest running as high as two hundred and fifty per cent. per annum, . . to make an exhaustive study and then present the true facts to the public and to the legislature for appropriate action, and in co-operation with the public and particularly with employers of such borrowers to do what it can to defend the victims of the lenders from extortionate and usurious collection prohibited by law," but its real purpose is to put salary buyers in Atlanta, such as the plaintiff, out of business. In furtherance of this design the defendants have inaugurated, through the medium of "newspapers, radio, and possibly letters," a campaign against salary buyers, soliciting, encouraging, counseling, and advising customers of salary buyers "to . . repudiate their contracts," and to institute suits against salary buyers for the recovery of money, and informing them, as an inducement to institute such suits, that the lawyers on said committee will represent them free of charge. Employers of customers of salary buyers have been urged in the same manner to co-operate in said campaign by assuring such employees that they "will not be *Page 368 
prejudiced in their employment by their violation of their contracts with salary buyers . . nor by their becoming involved in litigation with salary buyers," and by counseling, advising, and soliciting their employees dealing with salary buyers "to avail themselves of the free legal service of said bar association" in bringing suits in the courts of this State against salary buyers for the recovery of money. The defendants intend in this manner to stir up vexations suits and quarrels between salary buyers and the employers of their customers and between salary buyers and their customers. As a result of this campaign many of the customers of salary buyers, "including your petitioner," have been influenced to avail themselves of free representation by the lawyers on said committee, and have breached their contracts and instituted suits against salary buyers for "the recovery of alleged usury payments." The suits now pending and those the defendants seek to have filed "are not . . for the bona fide purpose of recovering any money, but for the unlawful purpose of harassing, vexing, injuring and damaging salary buyers and their business," in furtherance of their design to put salary buyers out of business.
Since the beginning of the present campaign the number of customers violating their contracts with salary buyers has doubled, but "it is impossible to tell which customers have since the commencement of said campaign . . violated their contracts on account of said campaign, and which ones have violated their contracts that would have done so without the commencement of said campaign," for the purpose of recovering damages against the defendants; and accordingly "unless defendants are restrained and enjoined from any further efforts to put salary buyers . . out of business by the methods herein complained of, petitioner will be irreparably injured and damaged." "Hundreds and possibly thousands of persons will be influenced" by the conduct of the defendants "to file suits in the courts of this county against salary buyers, at a large expense to taxpayers, to pay . . court officials to try such cases, and at a large expense to the salary buyers . . for attorney's fees, loss of time, . . other incidental expenses in defending such suits, and in the loss of court costs and all other expenses of litigation in cases lost by such customers as filed such suits and then go in bankruptcy to avoid the evil consequences of depending on said bar association to protect them against such *Page 369 
risks;" and "innumerable lawsuits for injunction and for damages, actual and punitive, will be made necessary and will be filed against various employers and their employees for participating, aiding, abetting, and assisting said bar association in its unlawful conspiracy against salary buyers," unless the defendants are enjoined from the further prosecution of said campaign. The conduct of the defendants, in voluntarily advising and calling upon customers of salary buyers to breach their contracts and to institute suits in the courts of this State against salary buyers for the recovery of money, and in offering the services of the lawyers on said committee to them free of charge for such purposes, is "illegal, unethical, and contrary to the public policy of this State," and tends to directly and immediately "injure, damage, and destroy salary buyers, including petitioner," in violation of his rights "to be secure in his property and in the conduct of his business unmolested and uninterfered with by defendants except in accordance with the laws of this State." Such conduct tends to excite and stir up vexatious lawsuits against salary buyers, and is prohibited by the Code, §§ 9-405, 9-9902. To permit the defendants to continue their campaign and destroy salary buyers will deprive them of their property without due process of law, in violation of the 5th amendment of the constitution of the United States (Code, § 1-805), and in violation of the 14th amendment of the constitution of the United States (Code, § 1-815), "because the business of salary buyers . . is a lawful business, licensed, taxed, and regulated by the State and also licensed and permitted by the City of Atlanta, and salary buyers, including your petitioner, are bounded [bonded] by the City of Atlanta for the protection of any person found by the courts to have injured or damaged such person in violation of the laws in the conduct of said business."
The defendants answered the petition. Omitting detailed elaboration, the answer set up in substance that the program of the association in connection with the usury committee is not directed against any particular type of person or corporation, but against "all lenders and salary buyers violating the law of Georgia by charging usurious interest or making illegal charges;" that it is not its purpose to drive out of business any person or corporation that is operating legally, but to lend its aid to stop illegal operation by any type of lender or salary buyer; that its real purpose is to require *Page 370 
all lenders and all salary buyers to comply strictly with the laws of Georgia, and "to defeat exaction of usurious interest or illegal charges by any and all types of lenders or salary-assignment purchasers;" that they are seeking to secure the co-operation of employees and employers in the program but have never "advised any person to disregard, breach, violate, renounce and repudiate any legal contract made by any such person." It was denied that the program of the association through its committee, to eliminate the lending of money at usurious rates of interest, and "to assist oppressed individuals who have been subjected to illegal and usurious charges," is illegal or contrary to the public policy of this State. The defendants allege that the plaintiff "does not come into equity with clean hands, . . and is not entitled to any relief by a court of equity," for the reason that he has failed to keep the book required of him by the Code, §§ 25-209, 25-212, which renders void ipso facto any license held by him," and is operating a money-lending business under the guise of a license issued to him as a salary buyer, and is lending money at usurious interest, contrary to the laws of the State.
The plaintiff attached to his petition two exhibits which he alleged to be statements that were issued by the president of the defendant bar association "in connection with said campaign against salary buyers." These exhibits so far as material here, are as follows:
First: "Members of the executive committee of the Atlanta Bar Association at a conference Saturday morning perfected plans for the furtherance of the campaign which the association has recently launched against persons and concerns violating the usury laws of the State. The campaign, which was inaugurated several weeks ago, is intended to eliminate so-called `loan sharks' operating lending agencies through which rates of interest in excess of that permitted by law are reported to have been charged. A committee of attorneys headed by Victor K. Meador was appointed earlier this month by Philip Alston Sr., president of the Atlanta Bar Association, to formulate plans for enforcement of usury laws in Atlanta, and to aid poor persons who have become involved with lending agencies charging usurious interest rates. At the meeting of the executive committee Saturday the committee on enforcement of usury laws was authorized in behalf of the Atlanta Bar Association to: (a) Investigate present usury laws, and to recommend legislative *Page 371 
changes, if needed, to prevent the collection of usurious interest from impoverished borrowers in Georgia. (b) To invite public co-operation in stamping out the violation of these laws, and to ask for information relative to persons and agencies guilty of charging usurious interest. (c) To request employers to advise their employees that the collection of usurious interest rates is forbidden by law, and to ask employees who may have become involved with usurious lenders to report such transactions to the committee on enforcement of usury laws; the employers being requested to notify their employees that they will not be discharged, suspended or criticized for defending against the exaction of illegal interest. (d) To aid persons, in resisting the illegal claims of so-called `money sharks,' such legal assistance to be rendered by members of the committee without charge.
"Letters addressed to employers, setting forth the plans of the committee and inviting their assistance, will be mailed out as rapidly as possible, so that persons, firms, and corporations, engaging large numbers of persons who may be involved in usurious interest transactions, may assure their employees that they will not be discharged or disciplined where suits are instituted against them on account of such transactions. The association points out that many persons are understood to be paying illegal rates of interest for money borrowed, and that in many instances these persons are being victimized because of a lack of legal advice as to their rights, or because of a fear of losing their jobs in the event the lenders complain to their employers. Members of the committee have emphatically declared that it is not their purpose to interfere with the operation of small-loan companies, credit unions, and similar agencies who conduct their businesses in accordance with the law. On the contrary, the association has called attention to the fact that such agencies as these, when complying with legal requirements, frequently serve an important public purpose of making funds available to needy borrowers on the basis of moral character, endorsements, or collateral security such as `used furniture.' The association intends only to do what it can to assist the public in eliminating the practice of charging excessive and illegal interest by persons and agencies commonly classified as `loan sharks.' . .
Second: "There has been widespread comment upon the campaign recently undertaken in Atlanta by the Atlanta Bar Association *Page 372 
looking toward the better enforcement of the usury laws of the State. Some of this comment has been critical, but by far the greater part of it has been in the nature of a commendation. The Association welcomes this public interest in its efforts, and is not surprised that there should have been criticism from some quarters. No worthwhile civic or social enterprise has ever been undertaken without some complaint being registered. Frequently this complaint comes from persons who, having profited by existing conditions, would prefer to see things left as they are. And of course there will be some criticism due to misunderstanding and misinformation as to the true aims of the association. I would like to clear up certain erroneous charges which have been made. In the first place the association is not undertaking to wage general warfare on all small-loan companies and lending agencies. Some of these agencies, perhaps many of them, are operating legally and in strict compliance with State laws. Some of them undoubtedly serve a useful purpose. But there is strong basis for believing that the field has been invaded by many individuals and persons who, purporting to operate in accordance with law, are in reality `racketeers' and violators of the usury laws. These are the individuals and persons who might properly classify as `loan sharks,' and it is against them and their kind that the campaign of the association is aimed. For years there have been rumors abroad in Atlanta to the effect that the so-called `loan sharks' were growing financially fat off the poor men and women, who, oppressed by poverty and confronted with emergencies, have become their borrowers. Sometimes we have been told the interest and other charges collected by this type of lender has run as high as 250 per cent. a year. The Atlanta Bar Association intends to find out whether these rumors are true, and if they are true it intends to do something about the situation, in so far as it is able to do so through the courts and the legislature. First of all, the association intends to make an exhaustive study, and on the basis of that study it plans to present the true facts to the public and to the legislature for such appropriate action as may be necessary. Secondly, the association intends, in co-operation with the public and particularly with employers of working men and women, to do what it can to defend the victims of the so-called `loan sharks' from extortionate and usurious collections which are prohibited by law. *Page 373 
The committee which represents the association in this work is composed of more than forty lawyers, many of them the busiest and most successful lawyers in the city. They intend to serve without remuneration or reward. They are not seeking work or compensation. But they do intend to see that no person who needs a lawyer to protect him from the `loan sharks' is without legal advice and representation. No amount of criticism from the `loan sharks' and their allies will divert these attorneys from what they conceive to be their professional and civic duty. If the Association is successful in this work, it will help the public in that it will rid the city of a type of racketeer that should be outlawed. It will help the victims of the loan sharks by assuring them adequate legal protection from illegal demands. It will help the legitimate loan companies and lending agencies by eliminating illegal competition. Doctors, druggists, grocers, and other legitimate business and professional men will be helped, since they will be enabled to collect their just bills out of funds which might otherwise go to the `loan sharks' in payment of usurious interest. I do not see how such a campaign can help but attract the whole-hearted support of all decent citizens. I have been pleased to note the support which has come from the public already, and I am sure that the few criticisms which have been voiced will vanish when the true purposes of the association are better understood. As far as the criticism of the loan sharks is concerned, it is neither important nor unexpected."
In his affidavit prepared for the interlocutory hearing the plaintiff stated: "that he is engaged in the business of buying salary and wage accounts under the trade-name of Acme Finance Company, . . in Atlanta, Fulton County, Georgia; that deponent is licensed by the State of Georgia, the County of Fulton, and the City of Atlanta to conduct the business of a wage and salary buyer . . . Deponent further says that his business has gone down since February 9, 1940, from day to day, until the volume of business done by deponent at the present time is not 50% of the volume deponent was doing prior to the 9th day of February, 1940; that customers repudiating their contracts of assignment with deponent since February 9, 1940, have grown to two or three times the number who repudiated their contract of assignment with deponent prior to February 9, 1940 . . . Deponent further says that the only *Page 374 
people with whom deponent does business are employed people, and the majority of deponent's customers are salaried men and women earning in excess of $100 a month, and a very large percentage of those who have repudiated their contracts since February 9, 1940, are persons earning more than $100 a month and a considerable percentage of them earning in excess of $200 per month. Deponent does not lend money, but purchases wage accounts." Attached to this affidavit as exhibits were the following: A statement made up by the defendant association and sent to various employers in Fulton County, to be distributed by such employers among their employees, and excerpts from the Atlanta Constitution newspaper of February 9, 10, 13, 18, 20, and 25. The statement is as follows:
"To all employees: The Atlanta Bar Association, in an effort to help individuals who are paying an illegal rate of interest for money borrowed from money sharks, has appointed a committee on enforcement of usury laws. The association desires to protect the rights of individuals who are in the power of illegal money lenders. The courts have ruled that the following types of loans are illegal:
"1. Assignment of salaries which are renewed each pay-day for several consecutive times, each assignment being in consideration of the cancellation of the old and a renewal charge of approximately 10% being assessed.
"2. Charges for endorsement by guarantors.
"3. Any loan on which there is collected more than 1 1/2% per month on the unpaid balance.
"Under Georgia laws many small-loan companies and credit unions operate in Atlanta on legal rates and terms. They lend to practically every person of good character on little or no security other than endorsements or used furniture. Notwithstanding the help so offered, some of our employees may have become involved with the so-called money sharks. This is a most regrettable condition. To correct this condition, the company, while believing that everybody ought to pay his just debts, recommends that its employees who may be involved in the condition described get in touch with a member of the said committee, whose names and addresses are listed on the back of this letter, and list with him his dealings with loan sharks. The committee will aid you in handling your problems. There will be no charge by the committee or any of its members for this service. The company will not discharge, suspend, *Page 375 
or criticize any employee carrying out these recommendations, but every opportunity will be given its employees to defend their rights. We want you to feel free to confer with Mr. ____ of this company, who will be glad to explain the above notice and advise with you in confidence."
Following are quotations from the newspaper articles:
Atlanta Constitution, February 9, 1940: "A strong fight against usurious rates charged many small borrowers in Atlanta, by money lenders who evade laws limiting interest, was launched last night by President Philip H. Alston and the executive committee of the Atlanta Bar Association. Appointment was authorized of a committee to enforce the usury laws of Georgia, to save thousands of people declared to be struggling in the grasp of lenders who sometimes charge as much as 260 per cent. per year. Victor K. Meador was named as chairman, and his 40 coworkers will be decided upon by late Monday. `Ninety per cent. of the people who go bankrupt in Atlanta are in the hands of money-lenders,' declared Chairman Meador. `When they are forced into bankruptcy, great injury is wreaked upon small merchants, doctors, grocers, landlords, and the like, with whom the debtors have legitimate relations. Thus it is to protect not only the borrower but a large group of innocent business men that the movement is planned.' When completely set up the committee will have at least three subcommittees to attain the following objectives: (1) Obtain employer co-operation and evidence of violations. (2) Seek civil remedies and the recovery of amounts illegally paid on usurious contracts. (3) Aid and sustain prosecution of flagrant violators. . . At the committee's disposal will be files of thousands of instances, recorded in affidavit form, illustrating the mesh of indebtedness in which the principals were declared to have struggled in silence until the burden forced them to appeal for relief. Georgia's highest legal rate of interest was said to be 18 per cent. per year."
Atlanta Constitution, February 10, 1940: "Salary buyers were attacked yesterday by Victor K. Meador, chairman of the Atlanta Bar Association's `Committee to Enforce Usury Laws,' as he prepared preliminaries of a campaign to end illegal charges of moneylenders declared to reach as high as 260 per cent. a year. . . `Profits so staggering as to defy all laws of economics and justice are extorted by "loan sharks" who now escape regulation by means *Page 376 
of the salary-buying dodge,' he declared in a formal statement of the committee's purposes. `Actually they lend money technically, they merely buy the right to collect a part of the victim's wages on the next pay-day. In most instances the wages are not earned when the alleged assignment is executed. . . Fear of the loss of his job through disclosure of his predicament often keeps a victim in the toils,' Mr. Meador explained. Purpose to create such a committee was ratified formally Thursday night by the executive committee of the bar association, meeting with President Alston, Mr. Meador, who has 4,000 instances of illegal interest charging in affidavit form, immediately was named to head the group. His statement in part: `Since the announcement of the Atlanta Bar Association that a committee has been appointed among its members to enforce the usury laws of Georgia a number of loan-shark victims have been to the committee with their tales of woe. Since the civic societies of Atlanta have ceased in their efforts to curb such activities, others engaged in questionable activities have invested large sums in the financial field. Loan sharks are economically strong, while their victims are economically weak. The conditions under which the loan shark and his victim meet lack that equality of bargaining power essential to just business transactions. When borrower and lender meet on such a basis, exaction of oppressive and unconscionable terms by the lender is certain. The harsh methods necessary to enforce these unconscionable terms greatly magnify the harm. The result is that the business inevitably leads to social deterioration, economic helplessness, unemployment, poverty and despair on the part of the borrowers, public charity for their families, and substantial lowering of the general welfare of the people. Wherever one finds a loan shark, there he will inevitably find the conditions here outlined. In other words, these conditions are natural and inevitable concomitants of the business of lending small sums in violation of usury and other regulatory laws. This committee, appointed by the Atlanta Bar Association, will function until the present conditions are remedied. Co-operation by civic organizations and public-spirited citizens in bringing about a solution is invited.'"
Atlanta Constitution, February 13, 1940: "Work was progressing yesterday on completion of personnel of the Atlanta Bar Association's `Committee on Enforcement of the Usury Laws,' *Page 377 
planned to wage a campaign against money-lenders who charge more than the legal rate of 18 per cent. a year. . . A formal statement was issued by the committee, discussing the present laws covering money-lenders. Many appeals from persons who told of paying as high as 5 per cent. a week were said to have been received, since announcement of the committee's formation. `Bootleg lenders,' said the statement, `have worked out elaborate schemes to evade the legal charge of 1 1/2 per cent. per month. The majority of applicants for loans of $25 to $100 can not get the money at a legitimate source and are forced to patronize the so-called salary-buyers, high-raters, and loan sharks.'"
Atlanta Constitution, February 20, 1940: "The Atlanta Bar Association's drive against loan sharks, who charge interest rates as high as 520 per cent. a year, took definite form yesterday in a conference of leaders to map procedure. . . It was announced that the meeting, which consumed nearly three hours, was devoted to a survey of the field. The first decision reached was to work for complete co-operation of employers with the movement to end `iniquitous rates,' not only in the interest of the direct victim, but of legitimate business houses, large and small, who suffer from his inability to pay. . . `Our work will be greatly simplified,' declared Chairman Meador, `if employers will assure employees of the safety of their jobs if they reveal the toils in which they are caught. A stern employer attitude is the sharks' handiest weapon of extortion; for the man in fear of his job will pay in silence, and the shark thrives.'"
Atlanta Constitution, February 25, 1940: "Four Bar Association Suits Seek Recovery of Interest. Test Cases Filed Charging Illegal Rates Were Paid. Committee Members Represent Plaintiffs. One Says He Was Charged $259 on $40. The Atlanta Bar Association yesterday filed four suits in an attempt to recover interest allegedly more than the legal rate, and possibly looking toward having the principal of an illegally high-rate loan declared forfeited by the lender. In one case, that of C. M. McCahan against the Ward Investment Company, recovery was sought of $259 declared to have been paid as interest on a loan of $40. In another, D. S. Sheppard against J. T. Baker, $145.80 was sought to be recovered as interest paid on a $12 loan. The third suit, D. S. Sheppard against Beeman Company Inc., asked return of $188 *Page 378 
allegedly paid on a loan of $40. The fourth, Carl Wester versus M. R. Markham and State Finance Company, recited $86 interest on a $20 loan. . . Meantime the executive committee of the bar association, meeting yesterday morning, formally approved plans of the committee to proceed along these lines: `(a) Investigate present usury laws and to recommend legislative changes, if needed, to prevent the collection of usurious interest from impoverished borrowers in Georgia. (b) To invite public co-operation in stamping out the violation of these laws and to ask for information relative to persons and agencies guilty of charging usurious interest. (c) To request employers to advise their employees that the collection of usurious interest rates is forbidden by law, and to ask employees who may have become involved with usurious lenders to report such transactions to the committee on enforcement of usury laws; the employers being requested to notify their employees that they will not be discharged, suspended, or criticized for defending against the exaction of illegal interest. (d) To aid persons in resisting the illegal claims of so-called "money sharks," such legal assistance to be rendered by members of the committee without charge.'" The defendants introduced the affidavits of five persons who had dealings with the plaintiff, of which that of C. M. McCahan is typical. His affidavit was as follows: "Deponent says that on or about May 16, 1938, he went to the office of C. E. Gunnels, trading as Acme Finance Company, in the Healey Bldg., Atlanta, Georgia, and there borrowed the sum of $35.00, on which amount deponent was charged 20% of the principal amount, or $7.00, as interest, for a period of one month, and that deponent was required to sign a paper which he has later been informed was a wage assignment, but that he was given nothing in evidence of the transaction, no copy of the paper he executed; that on June 15, 1938, when payment was due on said transaction, deponent paid to said C. E. Gunnels interest charges in the amount of $7.00, and immediately received back the amount of $40.00, executing a paper in the sum of $48.00, the $8.00 being interest for one month, which was to be paid July 15, 1938. Deponent says that thereafter, on or about the 15th day of each month, on deponent's pay-day, that he would pay to the said lender, C. E. Gunnels, the amount called for in the alleged assignment, to wit, $48.00, and immediately, upon the execution of a new paper in the same amount, would *Page 379 
receive back $40.00; that this procedure continued for several months until the first part of the year 1939, when deponent only paid the amount of the charges each month, to wit $8.00, and would sign a new paper, like unto the former papers, in the amount of $48.00, but that during 1939 and to Jan. 16, 1940, deponent was not required to pay the amount called for in the alleged assignment, but only the interest charges. Deponent says that he missed making a payment on Dec. 15, 1939, but that on Jan. 16, 1940, he was required to pay the sum of $16 as interest for two months, and executed a new paper in the amount of $48.00. Deponent says that he was never given a copy of any of the papers he signed, and was never given a receipt for any of the money paid, nor was he given anything in writing, or otherwise, to show evidence of the transactions; and that the papers he paid were all kept by the lender, C. E. Gunnels, trading as Acme Finance Company, and never returned to deponent. Deponent further says that he has been informed that the papers he signed were salary or wage assignments, but that he was never given a copy of said papers he signed; and that said C. E. Gunnels, trading as Acme Finance Company, never made any attempt to collect the wages from deponent's employer by reason of the assignment, and never served the alleged assignment or a copy of the same on deponent's employer, and so long as deponent was paying C. E. Gunnels said Gunnels made no objections to deponent collecting the money due him as wages. Deponent further says, that he was and is paid semi-monthly, on the 1st and 15th of each month, and that any wages covered by any alleged assignment was not due to be paid until after deponent had collected his pay the second pay-day following the date of execution; that deponent had nothing due him to sell to said C. E. Gunnels, which fact was known to C. E. Gunnels; that the taking of assignments and allowing deponent to make payments as above set out, and to renew the loan on his pay-day once each month, was a scheme and device used intentionally by said C. E. Gunnels, trading as Acme Finance Company, to evade the usury laws of Georgia."
Also introduced was the affidavit of Philip H. Alston, President of the Atlanta Bar Association, in part as follows: "Affiant . . states that . . the sole purpose of the Committee on Enforcement of Usury Laws is to see that the laws of Georgia are complied with by various persons and companies engaged in the business *Page 380 
of making loans or purchasing salaries, and to aid and assist persons having dealings with loan companies or companies purporting to take salary assignments, where such persons have been subjected to usurious interest charges or illegal charges of any nature whatsoever. . . Affiant further states that in his opinion there are many persons and/or companies operating illegally in Atlanta and Fulton County, Georgia; and that it is a matter of public interest going to the welfare of the entire community to see that usurious interest and illegal charges are eliminated, and that all companies lending money to salaried employees in small amounts, or taking salary assignments from such employees, be required to comply strictly with the laws of Georgia."
The foregoing statement presents somewhat in detail the case submitted to the judge in the superior court, on which he rendered the judgment complained of. The plaintiff sought to show such an unlawful interference with his business as would authorize an injunction. It seems to be generally recognized that in a proper case a court of equity has the authority to enjoin illegal interference with the right of one to carry on a lawful business. See 28 Am. Jur. § 116 et seq.; 30 Am.Jur. 55, Employing Printers' Club v. Doctor Blosser Co.,122 Ga. 509 (50 S.E. 353, 69 L.R.A. 90, 106 Am. St. R. 137, 2 Ann. Cas. 694); Southern Ry. Co. v. Chambers, 126 Ga. 404
(55 S.E. 37, 7 L.R.A. (N.S.) 926); Kinney v. Scarbrough,138 Ga. 77 (74 S.E. 772, 40 L.R.A. (N.S.) 473). It can not be held, however, under this or any other principle that has been brought to our attention, that the judge erred as a matter of law in refusing to issue the injunction prayed for in the present case. The evidence as a whole indicates that the acts and conduct of the defendants are designed to and have as their purpose the better enforcement of the usury laws of this State. They seek to ferret out and expose those engaged in loaning money to small-salaried borrowers at exorbitant rates of interest, to the end that they may be prosecuted. They seek to protect and relieve those who have borrowed money and are being required to pay excessive and illegal charges therefor. They have offered their services to such persons free of charge, to defend against such illegal *Page 381 
exactions and in the institution of actions to recover amounts illegally paid under loan contracts. For all of this they should be commended rather than condemned. It does not appear that the defendants have made any false representations or have published any libelous or slanderous statements to the public concerning the plaintiff. It does appear that they charged that many persons engaged in the business of buying salaries were in fact lending money at usurious rates of interest, and it appears from the evidence that, at least as to the plaintiff, there was some justification for the statement. While the plaintiff alleged that he was engaged in the business of buying salaries and as such was licensed by the State, the county, and the city, and stated in his affidavit in this connection that he "does not lend money but purchases wage accounts," the evidence introduced at the hearing by the defendants clearly indicated that under the guise of purchasing salaries he was actually lending money at grossly usurious rates of interest. No scheme or device has yet been invented, the substantial effect of which is to violate the usury laws of this State, that the courts have not condemned as such. While a bona fide purchase of earned wages is not a loan and is not governed by the laws relating to interest, it has many times been held that what may appear to be an assignment of wages may in substance and in fact be a loan at usurious rates of interest. See Parsons v. Fox, 179 Ga. 605 (176 S.E. 642); Portwood
v. Bennett Trading Co., 184 Ga. 617 (192 S.E. 217);Jackson v. Bloodworth, 41 Ga. App. 216 (152 S.E. 289);Hinton v. Mack Purchasing Co., 41 Ga. App. 823
(155 S.E. 78); Franklin Finance Cor. v. Head, 58 Ga. App. 475
(199 S.E. 59); Hanes v. Henderson, 58 Ga. App. 475 (199 S.E. 59). The evidence does not indicate that a single contract of the plaintiff, claimed to have been repudiated as a result of the campaign of the defendants, was a bona fide assignment of salary rather than a loan at usurious interest, which had not been fully paid off by such illegal charges, or that the plaintiff is in fact conducting a bona fide business of purchasing earned wages. The judge may well have concluded that the contrary was true, and it is entirely possible that he was impressed that to issue the injunction sought would be but to lend to the plaintiff the aid of the processes of a court of equity in a continuing violation of the usury laws of this State. Cf. Griffith v. Hapeville,182 Ga. 333 (2) (185 S.E. 522). *Page 382 
It is not wrongful to induce a repudiation of an illegal contract, 30 Am. Jur. 73, § 21; Dr. Miles Medical Co. v. John D. Park Sons Co., 220 U.S. 373 (31 Sup. Ct. 376,55 L. ed. 502). Nor was the defendant's offer to represent free of charge persons caught in the toils of the usurious moneylender in defending against such illegal exactions, and to represent them in bringing actions to recover amounts illegally paid under loan contracts, a violation of the Code, §§ 9-405, 9-9902, in reference to the solicitation of legal employment and the offense of barratry. We do not believe that it is true, as contended by counsel for the plaintiff, that the enforcement of the usury laws of this State is a matter solely for the law-enforcement officers and of those from whom usury is being exacted, and that it is illegal and unethical for lawyers to publicly criticize an alleged widespread violation of such laws and to seek to eradicate the evil by the means here shown. Much could be said as to why their position in the community makes it entirely appropriate that they undertake such a movement and assume such responsibilities in reference to the general welfare of the public. We see no reason why the judgment of the learned judge should be disturbed.
Judgment affirmed. All the Justices concur.